**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(MIAMI DIVISION)**

TOWN KITCHEN, LLC, individually and
on behalf of others similarly situated,

               Plaintiff,

v.

CERTAIN UNDERWRITERS AT
LLOYD'S, LONDON KNOWN AS
SYNDICATE ENH 5151, NEO 2468,
XLC 2003, TAL 1183, TRV 5000, AGR
3268, ACS 1856, NVA 2007, HDU 382,
PPP 1980, AMA 1200 ASC 1414 and
VSM 5678, INDIAN HARBOR
INSURANCE COMPANY, and HDI
GLOBAL SPECIALTY SE,

               Defendants.

_____/

Case No. 1:20-CV-22832-FAM

CLASS ACTION

## FIRST AMENDED COMPLAINT

      Plaintiff, Town Kitchen, LLC ("Town" or "Plaintiff"), on behalf of itself and all others

similarly situated, bring this action against Certain Underwriters at Lloyds, London known as

Syndicate ENH 5151, NEO 2468, XLC 2003, TAL 1183, TRV 5000, AGR 3268, ACS 1856, NVA

2007, HDU 382 , PPP 1980, AMA 1200 ASC 1414 and VSM 5678, Indian Harbor Insurance

Company, and HDI Global Specialty SE (altogether, "Defendants" or "Insurers"), for a declaratory

judgment of rights and obligations under the commercial property insurance policies issued by

Defendants, and on behalf of Town individually, for breach of contract and damages. Plaintiff

alleges as follows, based on personal knowledge, and upon information and belief as to all other

matters:

## I.   NATURE OF ACTION

1.      This  action arises out of Defendants' denial of coverage for time element losses and extra expense under an "all risk" insurance policy Defendants sold to Town.  The "all risk" policy does not include any exclusion for losses caused by virus or communicable disease.

2.      Town timely provided notice of its covered losses resulting from COVID-19 and associated governmental orders, but Defendants denied coverage without conducting a fair and thorough investigation.  Instead, Defendants assert that Town's claim, even though its policy does not exclude coverage for loss caused by viruses or communicable disease and provides coverage for "all risks of direct physical loss of or damage to property" unless otherwise excluded, are not covered losses.

3.      On behalf of itself and all others similarly situated policyholders, Town seeks declaratory relief.

On behalf of itself individually, Town also seeks damages for breach of contract. Town also seeks ancillary relief, including an award of damages, pre- and post-judgment interest on its damage award, costs, and attorneys' fees pursuant to Section 627.428, Florida Statutes and/or Section 626.9373, Florida Statutes.

## II.   PARTIES

4.      Plaintiff Town is a Florida limited liability company with its principal place of business at 7301 SW 57th Court, Suite 100, South Miami, Florida 33143 ("Town" or "the Property").

5.      Defendant Certain Underwriters at Lloyd's, London (hereinafter "Lloyds") subscribing to Policy Number AVS011418900 are certain syndicates in the business of issuing

policies of insurance, with their principal place of business in London, England.  Upon information and belief, the liabilities under Policy Number AVS011418900 are shared among a syndicate of underwriters identified only by a pseudonym and respective allocation of liability: ENH 5151(26%), NEO 2468 (4%), XLC 2003 (3.69%), TAL 1183 (1.28%), TRV 5000 (.37%), AGR 3268 (.74%), ACS 1856 (1.28%), NVA 2007 (1%), HDU 382 (3.38%), PPP 1980 (3.38%), XLC 2003 (8.5%), TRV 5000 (1.68%), AMA 1200 (3.38%), ACS 1856 (1.74%), ASC 1414 (2.52%), VSM 5678 (3.38%).

6.       Defendant Indian Harbor Insurance Company ("Indian Harbor") is a Delaware insurance company with its principal place of business in Stamford, Connecticut. Indian Harbor shares 15% liability under Policy Number AVS011418900.

7.       Defendant HDI Global Specialty SE ("HDI") is a foreign insurance company with its principal place of business in Hannover, Germany. HDI shares 18.68% liability under Policy Number AVS011418900.

### III.   JURISDICTION AND VENUE

8.       This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because Town and Defendants are citizens of different states and/or countries and the amount in controversy exceed $75,000 exclusive of interest and costs.

9.       Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) as a substantial portion of the acts and conduct giving rise to the Claim occurred in Miami-Dade County and the City of South Miami, which are located in this district and division, and at all material times the Defendants engaged in the business of selling insurance in Miami-Dade County.

## IV.   <u>GENERAL ALLEGATIONS</u>

<u>**Town's Business**</u>

10.     Town has operated as a dine-in local restaurant and popular bar in the heart of South Miami.

11.     Prior to the outbreak of COVID-19, the restaurant employed 24 to 28 employees at any given time, and operated seven (7) days per week serving lunch and dinner, as well as weekend brunch.

<u>**The Policy**</u>

12.     In exchange for payment of premium, Defendants sold Town an "all risk" commercial property insurance policy bearing policy no. AVS011418900, effective from April 10, 2019 to April 10, 2020, with a limit of liability of liability of $1,950,000.00 (the "Policy").  The Policy provides business interruption, extra expense, civil authority, and other coverages.  Upon information and belief, a true and correct copy of the Policy is attached as <u>**Exhibit A.**</u>   Per the terms of the Policy, the Defendants agreed to indemnify Town for time-element[1] losses, including business interruption, extra expense, and civil authority coverage.

13.     An "all-risk" policy provides the broadest coverage available. Under an all-risk policy, the insured's burden is limited—the insured need only show that a fortuitous loss occurred. The burden then shifts to the insurer to show that an express exclusion in the policy either bars or

---

[1]  "Time-element" coverage means the quantum of loss is tied to how long it takes to replace or repair damaged property or to return property to its intended use.

4

limits coverage.  The Policy is written on a standard Insurance Services Office ("ISO")[2] form

(form

CP 00 30 10 12 (2011)) and does not contain a virus exclusion, even though such an exclusion was

available to the Insurers since at least 2006.

14.     In the aftermath of the SARS pandemic of the early 2000s, ISO introduced form

CP 01 40 07 06 "Exclusion of Loss Due to Virus or Bacteria," conceding that the traditional ISO

property form—like the Policy here—covers losses due to viruses:

> Disease-causing agents may render a product impure (change its quality of substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve . . . business interruption (time element) losses. Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case.

*See* ISO Circular, July 6, 2006.

15.     The Insurers elected to sell Town a policy <u>without</u> the virus exclusion, and cannot

now re-write the Policy to exclude losses due to virus, such as COVID-19.

16.     The Insurers instead sold and promised to provide Town with coverage for loss

of Business Income, as set forth below:

> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations.  The loss or damage must be caused by or result from a Covered Cause of Loss.

---

[2] ISO is an insurance advisory organization that, among other things, provides pre-printed policy forms and endorsements that are widely used by insurers.

*See* Ex. A. at CP 00 30 10 12 p. 1 of 9.  The Policy has no sublimit for loss of Business Income, meaning the full amount of coverage is available.

17.      Covered causes of loss means direct physical loss unless the loss is excluded or limited in this Policy.   *See* Ex. A. at CP 10 30 09 17, p. 1 of 10.

18.      The Policy does not define the phrase "physical loss of or damage to property."

19.      The presence of the disjunctive "or" in "physical loss of or damage to property" means that coverage is triggered if *either* a physical loss to property or damage to property occurs.

20.      Per Merriam-Webster's online dictionary, the definition of "physical" includes "having material existence." [3]  COVID-19 undoubtedly has a "material existence," even though it is not tangible or perceptible by the naked eye.  Therefore, COVID-19 constitutes a "physical loss" with the meaning of the Policy.

21.      Physical loss of or damage to property may be reasonably interpreted to occur when a covered cause of loss threatens or renders property unusable or unsuitable for its intended purpose, or unsafe for normal human occupancy and/or continued use.

22.      The Policy's Business Income Coverage Part also includes coverage for Extra Expense:

***

b. Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

We will pay Extra Expense (other than the expense to repair or replace property) to:

---

[3] https://www.merriam-webster.com/dictionary/physical (last viewed July 18, 2020).

(1)    Avoid or minimize the "suspension" of business and continue operations at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location.

(2)     Minimize the "suspension" of business if you cannot continue "operations."

We will also pay Extra Expense to repair or replace property, but only to the extent it reduces the amount of loss that otherwise would have been payable under this Coverage Form.

*Id.* at 1-2 of 9.

23.    Under the Business Income Coverage Part, coverage is <u>extended</u> to include the following Civil Authority Coverage:

When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

(1)    Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile[4] from the damaged property; and

(2)    The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

*Id.* at p. 2 of 9.

**<u>The COVID-19 Pandemic</u>**

24.    In or around December 2019, the first case of COVID-19 or the novel Coronavirus was reported.  According to the World Health Organization, COVID-19 is "an infectious disease

---

[4] Pursuant to CP 01 25 02 12 "Florida Changes" at p. 2 of 3, "with respect to described premises location in Florida, such one-mile radius does not apply."

7

caused by a newly discovered coronavirus."[5]  COVID-19 can be transmitted from person to person, but can also be acquired after touching contaminated objects.

25.    According to the Center for Disease Control ("CDC"), "everyone is at risk for getting COVID-19."   A person may become infected by (1)  coming into close contact (about 6 feet) with a person who has COVID-19;  (2)  respiratory droplets when an infected person talks, sneezes, or coughs; and/or (3)  touching surfaces or objects that have the virus on them, and then touching his or her mouth, eyes, or nose.   *See*  https:www.cdc.gov.coronavirus/2019-ncov/faq.html;  *see also* Miami-Dade County Emergency Order 05-20 attached as **Exhibit B**.

26.    The time from exposure (infection) to the development of COVID-19 symptoms – the incubation period – can be up to fourteen days.[6]  During this period, those infected can be contagious and transmit the disease before they show any symptoms or have any reason to believe they are sick.[7]Asymptomatic carriers may also transmit the virus.  *Id*.  At least 44% of all infections occur from people without any symptoms.  *See* https: www.nature.com/articles/s41591-020-0869-5.

27.    Studies from the National Institutes of Health support that the virus may be detected in aerosols for up the three hours, on plastic and stainless steel for up to three days, and on

---

[5] https://www.who.int/health-topics/coronavirus#tab=tab_1.
[6] See https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_4#:~:text=The%20incubation%20period%20for%20COVID,occur%20before%20symptom%20onset (last viewed on July 9, 2020); *see also* https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html (last viewed on July 9, 2020

[7] *See* https://www.who.int/docs/default-source/coronavirus/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_4#:~:text=The%20incubation%20period%20for%20COVID,occur%20before%20symptom%20onset (last viewed on July 9, 2020).

cardboard for twenty-four hours. *See* https://www.nih.gov/news-events/nih-research-matters/study-suggests-new-coronavirus-may-remain-surfaces-days.[8]

28.     Over the last few months, COVID-19 has spread into a global pandemic.[9] In response to the pandemic, on March 9, 2020, the Governor of Florida, Ronald DeSantis, declared a State of Emergency in Florida related to COVID-19, recognizing that eight counties in Florida had positive cases for COVID-19 and the virus posed a risk to the entire State of Florida.  A few days later, Miami-Dade County Mayor Carlos Gimenez declared a State of Emergency for Miami-Dade County.

29.     On March 12, 2020, the Mayor of Miami-Dade County declared a State of Emergency for all of Miami-Dade County.  *See Miami-Dade County Declaration of Local State of Emergency* dated March 12, 2020 ("State of Emergency Order").   In the State of Emergency Order, the Mayor noted that "restaurants, bars, taverns, pubs, night clubs, banquet halls, cocktail lounges, cabarets, breweries, and cafeterias are potential gathering places for the spread of COVID-19/novel Coronavirus."

30.     On March 16, 2020, President Donald J. Trump and the Center for Disease Control ("CDC") issued the "15 Days to Slow the Spread" guidance advising individuals to adopt social distancing measures, such as avoiding gatherings of more than 10 people. On March 31, the President updated the guidance to "30 Days to Slow the Spread."

---

[8] *See also* https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces.
[9]  https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

31.     On March 17, 2020, the Mayor of Miami-Dade County issued Emergency Order 03-20, attached as **Exhibit C**, again recognizing that restaurants and bars "are potential gathering places for the spread of COVID-19" and ordering all restaurants in the County with seating for more than eight people to close on-premises service to customers.  Specifically, Miami-Dade County Emergency Order 03-20  provides, in pertinent part:

> 1.     All restaurants, bars, taverns, pubs, night clubs, banquet halls, cocktail lounges, cabarets, breweries, cafeterias, and any other alcohol and/or food service business establishment with seating for more than eight people within the incorporated and unincorporated areas of Miami-Dade County shall close on-premises service of customers.

32.     Also on March 17, 2020, the Governor of Florida issued Executive Order 20-68, attached as **Exhibit D,** requiring bars that derive more than 50% of their gross revenue from the sale of alcoholic beverages to suspend all sale of alcoholic beverages for thirty days.

33.     In light of the CDC's guidelines to slow the spread of COVID-19, on March 19, 2020 at 9:00 p.m., Mayor Gimenez ordered the closure of non-essential commercial establishments, including restaurants with dine-in operations.   *See* Miami-Dade County Emergency Order 07-20 attached hereto as **Exhibit E**.  In response, businesses all across Miami-Dade County shuttered their operations due to COVID-19, including Town.

34.     Ultimately, on April 1, 2020, Governor DeSantis issued a "Safer at Home" Order, Executive Order Number 20-91 mandating that all persons in Florida "limit their movements and personal interactions outside of their home to only those necessary to obtain or provide essential services or conduct essential activities."

10

35.     As a result of these restrictions, most non-essential businesses, including restaurants, retail establishments, and entertainment venues, have been forced to close.

36.     Included in many of the closure orders from around the country and within the State of Florida are declarations that the virus causes and has caused or imminently threatens physical loss or damage to property and human health.

37.     For example, on March 16, 2020, the City of New York issued an order stating: "the virus physically is causing property loss and damage." See New York City Emergency Executive Order 100 attached as **Exhibit F.**

38.     Similarly, Broward County issued at least two emergency orders recognizing "the virus is physically causing property damage due to its proclivity to attach to surfaces for prolonged periods of time." See Broward Cty. Emergency Orders 20-01 & 20-03; see also Walton Cty. Resolution 2020-30; City of North Miami "Safer At Home" Emergency Order; City of Aventura Order and Supplement to Declaration of State of Emergency; and City of Coral Gables Emergency Curfew Order, attached as **Composite Exhibit G.**

39.     On May 15, 2020, the Mayor of Miami-Dade County, Florida issued Emergency Order 23-20, attached as **Exhibit H**, which allowed most establishments, including restaurants, to operate, subject to certain restrictions to minimize the spread of COVID-19, including no more than 50% occupancy and 6 feet of social distancing for restaurants.   Order 23-20 includes 296 pages of restrictions and guidance for the reopening of business, including 13 pages protocols that restaurants must follow in order to reopen, including facility preparation, operational preparations, specific table arrangement requirements, employee procedures, etc.   A copy of Restaurant restrictions are attached as **Exhibit I.**  Significantly, the Restaurant restrictions included in Order

23-20 prohibit the sale of alcohol at bar counters.[10]   Since approximately 50% of Town's sales

are from alcoholic beverages, together with the requirement for no more than 50% occupancy, it

was not economically prudent to resume operations.

40.    On July 7, 2020, however, the Mayor of  Miami-Dade County, reversed course and

ordered the shut-down of indoor dining.   Amendment No. 2 to Miami-Dade County Emergency

Order No. 26-20, attached as **Exhibit J**,  provides:

> Commencing at 12:01 a.m., Thursday, July 9, 2020 and notwithstanding any other
> emergency order to the contrary, all restaurants, cafeterias, and other food service
> establishment with seating for more than eight people within the incorporated and
> unincorporated areas of Miami-Dade County shall be limited to offering outdoor on-
> premises service only.   Outdoor service of customers for on-premises consumption shall
> only be offered between the hours of 6:00 a.m. and 10:00p.m. each day and shall close at
> 10:00 p.m.  Notwithstanding the foregoing, between the hours of 10:00 p.m. and 6:00 a.m.,
> such establishments may operate their kitchens only for the purpose of providing delivery
> services, pick-up, room service, or take out services, and employees, janitorial personnel,
> contractors, and delivery personnel shall be allowed access to such establishments.  Table
> size at such establishments shall be limited to four persons per table, irrespective of whether
> those persons reside in the same household.  Music shall be eliminated or set at a decibel
> level below that of a normal conversation.

Due to the limited number of outdoor tables at Town, and spatial requirement, it was also not

economically prudent for Town to resume operations with outside seating only.

41.    On July 15, 2020, the Declaration of State of Local Emergency was extended

because there are over 287,700 cases of COVID-19/novel Coronavirus in Florida, including over

---

[10] See Page 29 of Restaurant restrictions, which provides:   "All bar counters must remain closed
to seating."

69,000 in Miami-Dade County.  As of July 23, 2020, those numbers of positive cases rose to 389,868 for the State of Florida, with 94,252 of the cases being in Miami-Dade County.[11]

**Town Suffered a Covered Loss**

42.    The above-referenced civil authority orders and the continuous spread and transmission of COVID-19 are covered causes of loss, not otherwise excluded under the all-risk Policy.

43.    COVID-19 has caused and continues to cause direct physical loss of or damage to Town, because the restaurant is unusable for its intended purpose or unsafe for normal human occupancy or continued use. The restaurant was insured to be used  as a dine-in facility, bar, and event space.  Because the highly contagious and deadly COVID-19 is physical, spread by human-to- human contact, aerosol, and surface contamination, Town can no longer serve its intended use, has suffered physical loss or damage, and has sustained a necessary suspension of its operations.

44.    The loss of functionality is no less physical than the impact of a property suffering damage from a hurricane that renders it unusable for its intended purpose.   Where once the property could carry on its business function, the property with a blown away storefront or roof or other hurricane damage cannot operate in that way.   Where once the property could seat patrons at its tables and serve them, it could no longer do so with hurricane damages and/or no roof.   Thus, the damage of a hurricane causing loss of function of the property and the loss of function caused by COVID-19 are one in the same, and such damage is covered under the Policy.

---

[11] Florida Department of Health COVID-19 Tracker, www.floridahealthcovid19.gov  (viewed on July 23, 2020.

45.     Moreover, the imminent threat of the presence of COVID-19 in and around the area immediately surrounding Town resulted in a direct physical loss of or damage to property, such that the continuation of business operations as normal would certainly and unavoidably cause physical loss of or damage to the Property, and/or cause further physical loss of or damage to the Property.

46.     As there is no method to test for the presence of COVID-19 on surfaces, as many of those afflicted with COVID-19 are asymptomatic yet able to transmit the virus, and as Town's employees and guests were so numerous, including visitors from other COVID-19 "hot spots," it is statistically certain that the virus was in and on the Property and was and continues to be on surrounding properties, and physical loss or damage must thus be presumed.

47.     Because of the foregoing, Town has suffered and continues to suffer a loss of Business Income.

48.     Town's closure also served to mitigate further loss(es).

49.     Town has also suffered a loss of Business Income caused by action of civil authority that prohibited access to the Property.

50.     Even though the one mile radius is inapplicable, Town is within one mile of many restaurants, cafes, bars, a hospital, and other businesses that have also suffered and continue to suffer direct physical loss of or damage due to COVID-19 as well as civil authority orders restricting and/or barring access to these businesses and properties by customers.

51.     In response to the dangerous physical conditions resulting from the presence and/or spread of COVID-19, the above-referenced civil authority orders have operated (and continue to operate) to prohibit access to Town and the immediately surrounding area.

14

52.     Town has also incurred and will continue to incur extra expenses during the necessary suspension of its business that it would not have incurred if there had been no direct physical loss of or damage to the Property caused by or resulting from COVID-19 and/or the above-referenced civil authority orders.  These include remediation and mitigation costs related to cleaning Property and to protect against the spread of COVID-19.

**Town's Claim and the Insurers' Lack of Meaningful Response**

53.     Town promptly notified the Insurers of a time-element loss under the Policy.  See Sworn Statement in Proof of Loss, attached as **Exhibit K**.

54.     The Insurers assigned Claim Number AMFL1720030032 (the "Claim").

55.     On March 30, 2020, Plaintiff contacted Defendants to inquire as to whether Defendants are providing coverage under the Policy based on the civil authority action requiring Plaintiff to shut down. Defendants' Claims Adjuster notified Plaintiff that Defendants are "still reviewing coverage." Plaintiff has repeatedly requested that Defendants provide clarity as to whether its claim is covered under the policy. On April 10, 2020, Defendants' Claims Adjuster advised Plaintiff that it is "still reviewing" the claim.

56.     On May 4, 2020, May 26, 2020, and June 26, 2020, the Insurers, through a third-party administrator, advised Town that  an investigation of the Claim was underway and requested additional information.   Plaintiff promptly provided written responses to the Insurers' requests. On July 2, 2020, Town provided an extensive amount of financial and operational information requested by Defendants.

57.     Just five (5) days after receiving Town's detailed submission, the Insurers denied the Claim, asserting that the Policy excludes loss relating to virus despite the plain language of the Policy to the contrary.   A copy of the Insurers' denial letter is attached as **Exhibit L**.

58.     The Insurers issued the declination of coverage without ever accessing, inspecting, or testing the Property, or otherwise meaningfully investigating all possible bases supporting Town's Claim.

59.     Town has incurred and continues to incur extensive time-element losses.  With every day that passes without indemnification for covered loss, the restaurant's future remains uncertain.

60.     Due to the Insurers' failure to afford coverage promptly, Town is in doubt of its rights under the Policy.

61.     Town has substantially performed or otherwise satisfied all conditions precedent to bringing this action and obtaining coverage pursuant to the Policy and applicable law, or alternatively, Town has been excused from performance by the Insurers' acts, representations, conduct, or omissions.

62.     Town has engaged the undersigned firms to represent it in this action, and has agreed to pay a reasonable fee for their services.

63.     Town offers to do equity in the premises.

## V.     CLASS ACTION ALLEGATIONS

64.     Plaintiff brings this action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure on its own behalf and on behalf of all entities that do business in Florida: (1) having the same standard commercial property insurance policies with the same language issued by

16

Defendants including business interruption and extra expense coverage that does not exclude coverage for pandemics and does not include the standard virus exclusion; and (2) which have suffered covered losses as described in this Complaint.

65.     Excluded from the Class are Defendants, their affiliates, their subsidiaries, and any officers, employees, attorneys, agents, legal representatives, heirs, successors and assigns.

66.     Upon information and belief, Defendants sell this type of insurance to thousands of businesses across Florida making joinder of all Class members impracticable.

67.     There are questions of law and fact that are common to the Plaintiff and the Class, including, but not limited to:

a.     Whether there is a bona fide dispute between the Parties as to the Parties'
       rights and obligations under Defendants' insurance policies; and
b.     Whether, properly interpreted under Florida law, Defendants' Policy
       provides time element coverage for COVID-19 related losses.

68.     Plaintiff's claims are typical of the claims of the Class Members. The practices alleged herein appear to be a standardized, and are based upon identical policy language.

69.     Plaintiff and counsel will fairly and adequately protect and represent the interest of each member of the Class. Plaintiff is committed to the vigorous prosecution of this Action and has retained competent counsel experienced in prosecuting both class actions and insurance coverage cases. The interests of Plaintiff are consistent with and not antagonistic to those of the other Class Members.

70.     Pursuant to Rule 23(b)(2), Defendants have acted or refused to act on grounds generally applicable to all members of the class, thereby making declaratory relief concerning the class as a whole appropriate.

# VI.   CAUSES OF ACTION

## COUNT I
## (BREACH OF CONTRACT)

71.     Plaintiff incorporates the allegations in paragraphs 1 through 70 as though fully set forth herein.

72.     Plaintiff brings this Count on behalf of itself only.

73.     The Policy is a contract under which the Defendants were paid premium in exchange for the promise to pay Town for covered losses, including business income, civil authority, and extra expense losses.

74.     At all times material to this action, Town was insured by Defendants under the Policy, which is an enforceable contract under the laws of the State of Florida.

75.     The Policy obligates Defendants to indemnify Town for direct physical loss of or damage to property  as a result of a covered loss under the following insuring agreement:

**A.     Coverage**

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

*See* Exhibit A. CP 00 10 10 12 at p. 1 of 16.

76.     The closure of Town and its ensuing business income, civil authority, and extra expense losses are covered losses under the Policy.

77.     Defendants have failed and refused to pay Town for losses sustained by Town in connection with its closure.

78.     No exclusions in the Policy apply to or bar coverage for Town's Claim.

79.     Town has complied with all terms and conditions of the Policy and/or those terms

18

and conditions have been waived by the Insurers or the Insurers are estopped from asserting them, and yet the Defendants have abrogated their obligations under the Policy.

80.      As a direct, foreseeable, and proximate result of Defendants' breach of its duties under the Policy, Town has suffered, and continues to suffer, damages, including but not limited to those described above and attorneys' fees, costs, and interest, in an amount to be determined at trial.

## COUNT II
## (Declaratory Relief)

81.      Plaintiff incorporates the allegations in paragraphs 1 through 70 as though fully set forth herein.

82.      Under Fla. Stat. § 86.011, et seq., the court may render declaratory judgments on the existence or nonexistence of any "immunity, power, privilege, or right," or "[o]f any fact upon which the existence or nonexistence of such immunity, power, privilege, or right does or may depend, whether such immunity, power, privilege, or right now exists or will arise in the future."

83.      There is a bona fide, actual, present practical need for the declaration. Plaintiff and the Class's businesses are currently non-operational, and their ability to survive this pandemic depends on their ability to obtain insurance coverage for their losses.

84.      The Policy constitutes a valid and binding agreement obligating the Insurers to indemnify Town for covered time-element losses.

85.      Despite timely notifying the Insurers of its loss and satisfying all conditions precedent under the Policy, the Insurers have failed to indemnify Town for its covered time-element loss(es).

86.     Town has suffered and continues to suffer a covered loss under the Policy.

87.      A justiciable controversy exists between the parties as to whether the Policy provides coverage for the Claim.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of itself only, requests that the Court:

1. Enter judgment in favor of Town and against Defendants, Certain Underwriters at Lloyds, London know as Syndicate ENH 5151, NEO 2468, XLC 2003, TAL 1183, TRV 5000, AGR 3268, ACS 1856, NVA 2007, HDU 382, PPP 1980, AMA 1200, ASC 1414 and VSM 5678, Indian Harbor Insurance Company, and HDI Global Specialty SE, for the full amount of the covered loss; compensatory damages, pre and post-judgment interest thereon; costs, and attorneys' fees pursuant to Fla. Stat. §§ 627.428, 626.9373, or applicable law; and

2. Award such other and further relief the Court deems just, proper, and equitable.

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, also requests that the Court:

3. Certify the proposed Class, designate Plaintiff as the named representative of the Class, and designate undersigned counsel as Class Counsel;

4. Issue a Declaratory Judgment declaring (a) Defendants' all risk policy provides coverage for COVID-19 related losses, (b) no exclusion under the Policy unambiguously bars or limits coverage for COVID-19 related losses, (c) the Insurers

are enjoined from denying claims for COVID-19 related losses on the grounds that the

virus does not cause physical loss of or damage to property, and;

5. Award such other and further relief the Court deems just, proper, and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff, Town Kitchen, LLC, individually and on behalf of others similarly situated,

demands a trial by jury on all issues so triable.


Dated:  July 23, 2020                               Respectfully submitted,

*/s/Michael E. Criden*
Michael E. Criden (Fla. Bar No. 714356)
Kevin B. Love (Fla. Bar No. 993948)
Lindsey C. Grossman (Fla. Bar No. 105185)
CRIDEN & LOVE, P.A.
7301 SW 57th Court
Suite 515
South Miami, FL 33143
Telephone:  (305) 357-9000
Email:  mcriden@cridenlove.com
Email:  klove@cridenlove.com
Email:  lgrossman@cridenlove.com

and

*/s/ Jason S. Mazer*
Jason S. Mazer (Fla. Bar No. 0149871)
CIMO MAZER MARK, PLLC
100 Southeast Second Street
Suite 3650
Miami, FL 33143
Telephone:  (305) 374-6481
Facsimile:  (305) 374-6488
Email:  jmazer@cmmlawgroup.com

22

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 23, 2020, I electronically filed this Response with the Clerk of Court using CM/ECF.   I also certify that the foregoing document is being served this day on parties listed in the below Service List via transmission of Notices of Electronic Filing generated by CM/ECF or in some other manner.


*<u>/s/ Jason S. Mazer</u>*

## SERVICE LIST

John D. Mullen, Essq.
Sarah B. Van Schoyck, Esq.
Jason A. Pill, Esq.
Phelps Dunbar
100 South Ashley Drive
Suite 2000
Tampa, FL  33602-5311
Johm.mullen@phelps.com
Sarah.vanschoyck@phelps.com
Jason.pill@phelps.com

*Counsel for Defendants*