**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

TOWN KITCHEN LLC,
individually and on behalf of
those similarly situated,

      Plaintiff,                        CIVIL ACTION NO. 1:20-cv-22832-FAM

v.

CERTAIN UNDERWRITERS AT LLOYDS,
LONDON, KNOWN AS SYNDICATE ENH 5151,
NEO 2468, XLC 2003, TAL 1183, TRV 5000, AGR
3268, ACS 1856, NVA 2007, HDU 382, PPP 1980,
AMA 1200, ASC 1414, and VSM 5678, and INDIAN
HARBOR INSURANCE COMPANY, and HDI
GLOBAL SPECIALTY SE,

      Defendants.

---

## MOTION TO DISMISS FIRST AMENDED COMPLAINT AND TO STRIKE COMPLAINT ALLEGATIONS AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants Certain Underwriters at Lloyd's, London known as Syndicate ENH 5151, NEO 2468, XLC 2003, TAL 1183, TRV 5000, AGR 3268, ACS 1856, NVA 2007, HDU 382, PPP 1980, AMA 1200, ASC 1414 and VSM 5678 ("Underwriters"), Indian Harbor Insurance Company ("Indian Harbor"), and HDI Global Specialty SE ("HDI") (collectively, the "Insurers"), move to dismiss the First Amended Complaint (the "Complaint") filed by Plaintiff Town Kitchen, LLC ("Town Kitchen") (Dkt. 6) for failing to state a claim for relief.  If the Court does not dismiss the Complaint entirely, the Insurers move to strike the class allegations pursuant to Rules 12(f), 23(a), 23(b), and 23(d).

### SUMMARY OF THE ARGUMENT

This is a case where an insured seeks damages under a commercial property insurance policy, but no property loss or damage has occurred.  Specifically, Town Kitchen, which operates a restaurant in South Miami, seeks business interruption and extra expense coverage for losses

resulting from the alleged suspension of its operations related to the COVID-19 pandemic.  As the insured, Town Kitchen bears the burden of affirmatively establishing a "covered cause of loss" as a result of "physical loss of or damage to" the insured premises.  Town Kitchen, however, cannot satisfy this threshold requirement.

Town Kitchen's Complaint does not plausibly allege any facts that would establish coverage under its property insurance policy because Town Kitchen's property was not physically damaged or destroyed, and Town Kitchen was not prohibited from accessing (or allowing customers to access) its premises by the action of any civil authority.  To the contrary, the government orders cited by Town Kitchen in its Complaint actually *encouraged* restaurants, like Town Kitchen, to remain open for takeout and delivery service, and even expanded those services to include the sale of alcoholic beverages for off-premises consumption.  Town Kitchen voluntarily elected to shut down its operations (before the orders cited in its Complaint) and lost income as a result.  These economic losses are not covered under Town Kitchen's property insurance policy, and this is consistent with multiple COVID-19 closure rulings issued by federal and state courts that have found no business interruption coverage under similar property insurance policies.

Even if Town Kitchen could establish an affirmative right to coverage under the policy, which it cannot, coverage would be barred by the pollution exclusion because the Policy precludes coverage for any claim related to substances that pose a threat to human health—such as COVID-19.  For that additional reason, the Court should dismiss the Complaint.

Although Town Kitchen has not pled sufficient factual allegations to establish that its alleged losses are covered by the Policy, the Complaint attempts to certify a statewide class of policyholders who experienced similar "covered losses" related to COVID-19.  However, as framed by the Complaint, the proposed class cannot be ascertained and, even if could, the class

seeks improper relief.  The Court should address these deficiencies now because they otherwise will render these proceedings unmanageable and waste judicial and party resources going forward.

## THE POLICY AND TOWN KITCHEN'S ALLEGED LOSS

1.      The Insurers issued to Town Kitchen an all-risk commercial property insurance policy containing business interruption, extra expense, and civil authority coverage, bearing policy number AVS011418900, effective from April 10, 2019 to April 10, 2020 (the "Policy").  Dkt. 6 at ¶ 12; Dkt. 6-1.  Town Kitchen submitted a claim to the Insurers seeking recovery for business income loss under the Policy as a result of local and state orders related to COVID-19.  Dkt. 6 at ¶ 53. The Insurers denied the claim.  Dkt. 6 at ¶ 57.

2.      Subject to certain terms, conditions, exclusions, and endorsements, the Policy provides insurance coverage for Town Kitchen's property located at 7301 SW 57th Court, Suite 100, South Miami, Florida 33133 (the "Property").  Dkt. 6-1.

3.      The Policy requires "direct physical loss of or damage to property" to trigger coverage under the business interruption, extra expense, and civil authority coverage.

4.      While the Policy does provide coverage for a loss of "Business Income," the loss must arise out of direct physical loss of or damage to the Property.   Specifically, the "Business Income" coverage states in relevant part:

### BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM

**A.  Coverage**

**1.  Business Income**

*** 

We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit Of Insurance is shown in the Declarations. The

> loss or damage must be caused by or result from a Covered
> Cause of Loss. . . .

Dkt. 6-1 at pp. 46-47, CP 00 30 10 12.  Pursuant to these provisions, Town Kitchen must sustain

a loss of business income or extra expense due to a suspension of operations caused by "direct

physical loss of or damage to property" at its premises to trigger coverage.  *Id.*

    5.    The Policy also provides "Civil Authority" coverage, but consistent with the

fundamental principle of this property Policy, the Civil Authority action must result from damage

to property caused by a Covered Cause of Loss:

> **5**.  **Additional Coverages**
>
> **a.**  **Civil Authority**
>
>> In this Additional Coverage – Civil Authority, the described
>> premises are premises to which this Coverage Form applies,
>> as shown in the Declarations.
>>
>> When a Covered Cause of Loss causes damage to property
>> other than property at the described premises, we will pay
>> for the actual loss of Business Income you sustain and
>> necessary Extra Expense caused by action of civil authority
>> that prohibits access to the described premises, provided that
>> both of the following apply:
>>
>> **(1)** Access to the area immediately surrounding the damaged
>> property is prohibited by civil authority as a result of the
>> damage, and the described premises are within that area
>> but are not more than one mile from the damaged
>> property; and
>>
>> **(2)** The action of civil authority is taken in response to
>> dangerous physical conditions resulting from the
>> damage or continuation of the Covered Cause of Loss
>> that caused the damage, or the action is taken to enable a
>> civil authority to have unimpeded access to the damaged
>> property.

Dkt. 6-1 at p. 47, CP 00 30 10 12.  The Civil Authority coverage also requires that the action of

civil authority prohibited access to the Property.  *Id.*

    6.    Town Kitchen alleges that a series of orders issued by the Governor of the State of

Florida and the Mayor of Miami-Dade County effectively limited on-premises dining and operations, Dkt. 6 at ¶¶ 28-40,[1] resulting in a suspension of its operations and an immediate loss of Business Income and Extra Expense under the Policy starting on on March 3, 2020 (according to Town Kitchen's Proof of Loss).[2] *See* Dkt. 6-11.

    a.   On March 17, 2020, Miami-Dade County Mayor Carlos Gimenez issued Emergency Order 03-20, which required restaurants to suspend dine-in services but permitted delivery, pick-up, and take-out services.  Dkt. 6-3.  The order expressly allowed employees and other personnel to access the establishments to continue operations.  *Id.* at p. 3.

    b.   Also on March 17, 2020,  Florida Governor Ron DeSantis issued Executive Order 20-68, directing restaurants to adhere to social distancing guidelines by limiting the number of patrons allowed within a building and requiring patrons to maintain a six-foot distance.  Dkt. 6-4.  The order did not restrict a restaurant's ability to remain open for delivery, pick-up, and take-out services.  *Id.* at p. 3.

    c.   On March 19, 2020, Mayor Gimenez issued Emergency Order 07-20, ordering the closure of non-essential businesses.  Dkt. 6-5.  Restaurants, however, were deemed to be essential and permitted to continue operations.  *Id.* at pp. 3-4.

    d.   On April 1, 2020,  Florida Governor Ron DeSantis issued Executive Order 20-91, encouraging restaurants to "provide delivery, carry-out or curbside service . . . to

---

[1] Town Kitchen also cites to various news articles, guidance issued by the Centers for Disease Control & Prevention, studies from the National Institutes of Health, and governmental orders from other jurisdictions (such as Broward County, Walton County, and even New York City).  Dkt. 6-6, 6-7. For the purposes of this motion, the Insurers accept these allegations as true, but note that such orders and authorities are not binding upon Town Kitchen or its operations located in Miami-Dade County, and therefore cannot be the basis of Town Kitchen's alleged losses.

[2] Curiously, the date of loss identified on the Proof of Loss submitted to the Insurers (Dkt. 6-11), is March 3, 2020, which predates all of the governmental shutdown orders cited in Town Kitchen's Complaint.  Dkt. 6 at ¶¶ 28-40.

the greatest extent practicable."[3]   Dkt. 6 at ¶ 34; attached as Exhibit 1. The Governor's order incorporated Mayor Gimenez's Emergency Order 07-20 (Dkt. 6-5), deeming restaurants essential businesses that could remain open, so long as they adopted certain safety measures (e.g., suspending dine-in services).[4]

e.   On May 15, 2020, Mayor Gimenez issued Emergency Order 23-20 limiting occupancy of businesses and establishments to 50% of the authorized total occupancy load and implemented certain safety standards.  Dkt. 6-8.

f.   On July 7, 2020, Mayor Gimenez issued Emergency Order 26-20 prohibiting indoor dining at restaurants and implementing a curfew of 10:00 pm.  Dkt. 6-10. The order allowed outdoor dining and takeout services to continue, and confirmed that restaurant staff could access the premises during the curfew hours for them to operate their kitchens for the purposes of providing delivery services.  *Id.* at p. 4.

7.     These orders were not issued as a result of any "direct physical loss of or damage to" property, but instead to slow the spread of COVID-19 by minimizing contact between individuals.  Dkt. 6-3, 6-4, 6-5, 6-8, 6-9, 6-10.

8.     Town Kitchen, however, alleges that these government orders and the continuous spread and transmission of COVID-19 are covered causes of loss under its commercial property insurance policy, and that COVID-19 has caused and continues to cause direct physical loss of or

---

[3] Governor DeSantis's April 1 order is cited in the Complaint, but not attached.  When ruling on a motion to dismiss, the Court may consider a document that is not attached to the complaint if (1) "a plaintiff refers to a document in its complaint, the document is central to its claim, its contents are not in dispute, and the defendant attaches the document to its motion to dismiss," or (2) it is a matter of public record, such as a government order. *Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007); *Myers v. Foremost Ins. Co.*, No. 8:15-CV-1363, 2015 WL 12830477, at *3 (M.D. Fla. Oct. 23, 2015) (citing *SFM Holdings, Ltd. v. Banc of Am. Secs., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010)).

[4] Prior to Order 20-91, on March 20, 2020, Governor DeSantis issued Executive Order 20-71.  Attached as Exhibit 2. This order suspended existing regulations by allowing restaurants to sell alcohol for off-premises consumption.

damage to the Property because the restaurant is unusable for its intended purpose or unsafe for normal human occupancy or continued use.  Dkt. 6 at ¶¶ 42-45.

9.     Town Kitchen does not allege that COVID-19 was present at its premises at any time.  Rather, Town Kitchen only alleges that it is "statistically certain that the virus was in and on the Property and was and continues to be on surrounding properties, **and physical loss or damage must thus be _presumed_**."  Dkt. 6 at ¶ 46 (emphasis added).  Moreover, Town Kitchen does not allege that it was forced to close because of these various orders, only that it did so because "it was not economically prudent to resume operations."  Dkt. 6 at ¶¶ 39-40.

10.     Under each of the forgoing government orders, restaurants like Town Kitchen were allowed to continue their businesses for takeout and delivery service and were even allowed to expand carryout service to include the sale of off-premises alcoholic beverages.  _See_ Dkt. 6-3, 6-4, 6-5, 6-8, 6-9, 6-10; Exs. 1-2.  None of these orders required Town Kitchen to cease operations or prohibited access to the Property.  _See id._ Indeed, the government orders encouraged restaurants like Town Kitchen to offer food and beverage using delivery or pick-up service, and Florida and Miami-Dade County residents were permitted to engage in activities of obtaining necessary supplies and services, which included delivery or carry-out services from restaurants.  _See id._

### LEGAL AUTHORITY REQUIRING DISMISSAL

Under Rule 12(b)(6), dismissal is proper if a complaint fails to allege "enough facts to state a claim to relief that is plausible on its face."  _Bell Atl. Corp. v. Twombly_, 550 U.S. 544, 570 (2007).  "A complaint that does not contain sufficient factual matter, accepted as true, to state a claim plausible on its face is subject to dismissal."  _Houston Specialty Ins. Co. v. Vaughn_, 8:15-CV-2165-T-17AAS, 2016 WL 7386957, at *3 (M.D. Fla. Aug. 4, 2016) (citing _Am. Dental Ass'n v. Cigna Corp._, 605 F.3d 1283, 1289 (11th Cir. 2010)).  "While 'detailed factual allegations' are

not required, mere 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action' are not enough." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"The interpretation of insurance policies, like the interpretation of all contracts, is generally a question of law." *Goldberg v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 143 F. Supp. 3d 1283, 1292 (S.D. Fla. 2015) (citing *Lawyers Title Ins. Corp. v. JDC (Am.) Corp.*, 52 F.3d 1575, 1580 (11th Cir. 1995)). Florida law "provides that insurance contracts are construed in accordance with the plain language of the policies as bargained for by the parties." *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000) (citing *Prudential Prop. & Cas. Ins. Co. v. Swindal*, 622 So. 2d 467, 470 (Fla. 1993)). "The scope and intent of insurance coverage is defined by the language and the terms of the insurance policy, and where the language of the policy is plain and unambiguous, the contract must be enforced as written." *Fabricant v. Kemper Indep. Ins. Co.*, 474 F. Supp. 2d 1328, 1330 (S.D. Fla. 2007) (citing *Siegle v. Progressive Consumers Ins. Co.*, 819 So. 2d 732, 734-35 (Fla. 2002)). To the extent the terms of an insurance contract negate or contradict the pleader's allegations or causes of action, the terms of the insurance contract govern. *See Global Aerospace, Inc. v. Platinum Jet Mgmt., LLC*, 2011 WL 248543, *5 (S.D. Fla. Jan. 24, 2011) (citing *Crenshaw v. Lister*, 556 F.3d 1283, 1292 (11th Cir. 2009)).

**ARGUMENT**

**I.    Town Kitchen fails to allege "Direct Physical Loss of or Damage to" the Property.**

Florida law places the burden on the insured to prove a loss that falls within the policy's affirmative grant of coverage. *See S.O. Beach Corp. v. Great Am. Ins. Co. of New York*, 305 F. Supp. 3d 1359, 1364 (S.D. Fla 2018), *aff'd*, 791 F. App'x 106 (11th Cir. 2019). As such, to state a valid cause of action, Town Kitchen must allege ultimate facts that bring the claim within the policy's insuring agreement. *See Timber Pines Plaza, LLC v. Kinsale Ins. Co.*, 192 F. Supp. 3d

1287, 1293 (M.D. Fla. 2015). Town Kitchen fails to carry its burden of pleading a loss covered under the Policy because it cannot plausibly allege that it suffered property damage, which is fatal to its breach of contract claim and claim for declaratory relief.

### A.      "Direct Physical Loss of or Damage to" the Property requires physical alteration of or damage to the property, and none has occurred here.

Florida courts recognize the requirement of physical loss or damage to establish a "Covered Cause of Loss" under business interruption and extra expense provisions in a commercial property insurance policy. *See, e.g., Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Texpak Group, N.V.*, 906 So. 2d 300, 302 (Fla. 3d DCA 2005) ("[B]usiness interruption and extra expense losses are covered only if 'resulting from' damage or destruction of real or personal property caused by a covered peril."); *see also Ramada Inn Ramogreen, Inc. v. Travelers Indem. Co. of Am.*, 835 F. 2d 812, 814 (11th Cir. 1988) (explaining that "recovery is intended when the loss is due to inability to use the premises where the damage occurs"); *Mama Jo's, Inc. v. Sparta Ins. Co.*, 17-CV-23362-KMM, 2018 WL 3412974, at *9 (S.D. Fla. June 11, 2018), *aff'd* No. 18-12887, 2020 WL 4782369, at *8 (11th Cir. Aug. 18, 2020) (holding that increased cleaning due to dust and debris does not constitute "direct physical loss" because there was no actual change in the insured property and the property did not become "uninhabitable" or "substantially unusable"); *Dictiomatic Inc. v. U.S. Fid. & Guar. Co.*, 958 F. Supp. 594, 603 (S.D. Fla. 1997) (the insured must prove there was a direct physical loss of or damage to covered property).[5]

---

[5] Courts in other jurisdictions similarly hold that no coverage exists in the absence of physical damage to the insured premises. *See, e.g., Universal Image Prods., Inc. v. Fed. Ins. Co.*, 475 F. App'x 569 (6th Cir. 2012) (no "direct physical loss or damage" where presence of bacteria in the air conditioning system did not cause tangible damage to insured premises); *Source Food Tech., Inc. v. U.S. Fid. & Guar. Co.*, 465 F.3d 834 (8th Cir. 2006) (recognizing orders banning the delivery of beef based on the potential for the beef to be contaminated with mad cow disease did not establish any direct physical loss where no proof of contamination was shown because such coverage would render the word "physical" meaningless); *Phoenix Ins. Co. v. Infogroup, Inc.*, 147 F. Supp. 3d 813 (S.D. Iowa 2015) ("[M]ere loss of use does not constitute physical loss or damage" and that an "interpretation of physical loss as only loss of use stretches 'physical' beyond its ordinary meaning and may, in some cases, 'render the word 'physical' meaningless'"); *accord Newman Myers Kreines Gross Harris, P.C. v. Great Northern Ins. Co.*, 17 F. Supp. 3d 323 (S.D.N.Y. 2014)

PD.29334995.1

The decision in *Mama Jo's* illustrates this point.  In that case, as recently affirmed by the Eleventh Circuit, Judge Moore found that a nearly identical commercial property insurance policy did not provide coverage for business income loss and extra expense because there was no direct physical loss or damage to the insured's property.  2018 WL 3412974 at *10, *aff'd* 2020 WL 4782369 at *8.  The loss was alleged to result from extensive roadwork performed on the street adjacent to the restaurant.  2018 WL 3412974 at. at *1.  The insured alleged that it experienced over $292,500 in lost business income and spent more than $16,000 on cleaning construction debris from the property.  *Id.*  However, Judge Moore explained that "direct physical loss contemplates an actual change in insured property then in a satisfactory state, occasioned by accident or other fortuitous event directly upon the property causing it to become unsatisfactory for future use or requiring that repairs be made to make it so."  *Id.* at *9.  The dust and debris required extensive cleaning, but the court held that "**cleaning is not considered direct physical loss**."  *Id.* (emphasis added).  Judge Moore concluded that the insured could not show any suspension of operations caused by "physical damage," and the Eleventh Circuit affirmed the holding and corresponding denial of coverage.  *Id.*, *aff'd* 2020 WL 4782369 at *8.

As the *Mama Jo's* decision makes clear, the phrase "direct physical loss of or damage to" "must be given its common meaning."  *Rockhill Ins. Co. v. Northfield Ins. Co.,* 297 F. Supp. 3d 1279, 1286 (M.D. Fla. 2017).  To that end, the Eleventh Circuit confirmed that, "under Florida law, an item or structure that merely needs to be cleaned has not suffered a 'loss' which is both 'direct' and 'physical.'"  *Mama Jo's Inc.,* 2020 WL 4782369 at *8 (recognizing that a "direct physical loss" requires the damage to be "actual").  Consistent with the Eleventh Circuit's conclusion, Couch on Insurance instructs that:

> The requirement that the loss be "physical," given the ordinary definition of that term, is widely held to exclude alleged losses that

are intangible or incorporeal and, thereby, **to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property**.

2018 WL 3412974 at *9 (quoting 10A Couch on Ins. § 148:46 (3d ed. 1998)) (emphasis added).

Indeed, multiple federal and state courts ruling on similar COVID-19 issues have held that COVID-19 does not cause direct physical loss of or damage to an insured's property, and thus does not trigger coverage under a commercial property policy.  Recently, Judge Ezra of the United States District Court for the Western District of Texas granted an insurer's motion to dismiss with prejudice because the insureds' allegations based on COVID-19 and civil authority orders "failed to plead a direct physical loss," as required to trigger coverage.  *Diesel Barbershop, LLC, et al. v. State Farm Lloyds*, Case No. 5:20-cs-461-DAE (W.D. Tex. Aug. 13, 2020) (Order attached as Exhibit 3) (holding direct physical loss requires "tangible injury to [physical] property" and distinguishing COVID-19 cases from cases involving demonstrable "noxious odor" on property).

Shortly before that ruling, the Superior Court of the District of Columbia granted an insurer's motion for summary judgment because the insureds, a chain of restaurants, could not establish a direct physical loss of or damage to property.  *Rose's 1, LLC, et al. v. Erie Ins. Exch.*, Case No. 2020-CA-002424 (D.C. Super. Ct. Aug. 6, 2020) (Order attached as Exhibit 4).  The court rejected all of the insureds' arguments for coverage and explained that the insureds offered no evidence that COVID-19 was present at their restaurant.  *Id*. at p. 5.  Moreover, in confirming that the government orders did not constitute "direct physical loss of or damage to" the property, the court reiterated the materiality requirement to trigger coverage under a property policy:

> [U]nder a natural reading of the term "direct physical loss," the words "direct" and "physical" modify the word "loss." As such, pursuant to Plaintiffs' dictionary definitions, any "loss of use" must be caused, without the intervention of other persons or conditions, by something pertaining to matter—in other words, a direct physical

*Id.*     intrusion on to the insured property.

Likewise, in a ruling from Michigan, the circuit court granted summary disposition against a restaurant seeking business interruption coverage after having to close down in response to local COVID-19 government orders.   In finding no coverage, the court explained that only direct physical loss was covered, which had "to be something with material existence . . . something that is tangible." Videoconference, Mtn. for Summary Disposition, *Gavrilides Mgmt. Co. v. Mich. Ins. Co.*, No. 20-258-CB (Mich. Cir. Ct. July 1, 2020) (Order and transcript attached as Exhibit 5, 18:20-19:14).[6]   Because the insured only alleged a loss of income due to government-required closures and no physical damage caused by COVID-19, there were no allegations of physical loss of or damage to the property, and thus no coverage.[7]  *Id.*

Consistent with these recent COVID rulings, *see id.*, the government orders cited by Town Kitchen do not transform its purely economic losses from a suspension of one of its desired uses of the Property into physical loss or damage.  It is not Town Kitchen's premises themselves that are unsafe, but the possible threat of transmitting COVID-19 among large groups of people within any area.  Notably, Town Kitchen has not alleged that physical characteristics changed to make the Property unsafe for customers.  Indeed, under each of the orders applicable to Town Kitchen, *see* Dkt. 6-3, 6-4, 6-5, 6-8, 6-9, 6-10, Town Kitchen was allowed to keep operating its premises and sell food for off-premises consumption.  Town Kitchen's employees and customers still were

---

[6] *See also The Inns by the Sea v. Cal. Mut. Ins. Co.*, Case No. 20-cv-001274 (Cal. Sup. Ct. Aug. 6, 2020) (Order and transcript attached as Exhibit 6) (dismissing with prejudice for failing to state a claim plaintiffs' complaint seeking insurance coverage based on allegations of property damage and civil authority closures caused by COVID-19).

[7] Additionally, in the context of a lawsuit seeking injunctive relief against an insurer for business income coverage related to COVID-19, a federal district court similarly held that COVID-19 did not cause physical loss of or damage to an insured magazine publisher's property.  Teleconference, Order to Show Cause at 4-5, *Soc. Life Magazine, Inc. v. Sentinel Ins. Co. Ltd.*, No. 20-CV-3311-VEC (S.D.N.Y. May 14, 2020) (Transcript with oral findings attached as Exhibit 7).  With regard to COVID-19's impact, the court in *Society Life Magazine* noted: "It damages lungs.  It doesn't damage printing presses." (*Id.* at 4:25-5:4).

permitted to enter and use the Property.  Moreover, Town Kitchen has not alleged that COVID-19 actually contaminated the Property (only that the presence of COVID-19 was "statistically certain" and, thus, damage should be "*presumed*").  Dkt. 6 at ¶ 46.  None of the physical characteristics of the Property have changed, and there has been no physical loss of or damage to the Property.

The COVID-19 pandemic undoubtedly is challenging, and has had a significant financial impact on businesses, but the law dictates that "a court may not ascribe to a policy term a 'meaning deemed more socially responsible or desirable to the insured,'" nor may it "rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties." *Harrington,* 54 So. 3d at 1001-02; *Diesel Barbershop, LLC*, Case No. 5:20-cs-461-DAE, attached as Ex. 3 at p. 19 ("While there is no doubt that the COVID-19 crisis severely affected Plaintiffs' businesses, State Farm cannot be held liable to pay business interruption insurance on these claims as there was no direct physical loss").[8]  A plain reading of the Policy here leads to the conclusion that Town Kitchen's alleged loss is not covered, and the Court should dismiss the Complaint.

### B.    A partial limitation of Town Kitchen's operations unaccompanied by physical loss of or damage to the Property is not a covered loss.

The temporary limitation of Town Kitchen's ability to provide on-site consumption of food and beverages does not constitute "direct physical loss of or damage to" the Property.  Town Kitchen only alleges an intangible change to its business operations—not an alteration to the physical characteristics of the Property itself, as explained above.  *See Rose's 1, LLC*, Case No.

---

[8] All can appreciate the severity of this pandemic and the financial effects it has had on businesses, including Town Kitchen.  But, the remedy cannot be found by businesses asking courts to re-write their property insurance contracts to provide coverage that was not bargained for.  Doing so would compel insurers to subsidize the economic impact of the COVID-19 pandemic, with coverage neither contemplated by the policies nor purchased by the insureds. Businesses, however, are not without recourse.  The government passed the $2 trillion CARES Act (earmarking $8.3 billion for small businesses)—with more assistance available at the state level.  These programs may provide relief to Town Kitchen and similarly-situated businesses, but it is neither the equitable nor legal solution to re-write Town Kitchen's property insurance contract and gratuitously create coverage where none exists. *See Intervest Const. of Jax, Inc. v. Gen. Fid. Ins. Co.,* 133 So. 3d 494, 497 (Fla. 2014).

2020-CA-002424, attached as Ex. 4 at p. 9 ("[I]n the context of property insurance, the term 'direct loss' implies some form of **direct physical change** to the insured property.") (emphasis added).

The loss alleged by Town Kitchen is similar to a change in zoning resulting in different hours that a business can be open or a temporary suspension of a liquor license. In these circumstances, courts have found that the insured did not suffer a "direct physical loss of or damage to" the property, and therefore no coverage exists under an all-risks property insurance policy. *See infra* pp. 14-15. Indeed, "direct physical loss of or damage to" the Property requires more than a partial limitation of operations that is unrelated to any damage to the structure or composition of the Property. *Mama Jo's, Inc.*, 2018 WL 3412974, at *10, *aff'd* 2020 WL 4782369 at *8.

Addressing an analogous argument in *Roundabout Theatre Co. v. Continental Casualty Co.*, the court held there was no "direct physical loss or damage" under a commercial property insurance policy after the insured's theatre became inaccessible because the city closed a nearby street after a building collapsed after a construction accident. 302 A.D.2d 1 (N.Y. App. Div. 2002). The court rejected the insured's argument that "loss" should be read to include "loss of use" as a result of the construction accident on a nearby property because the insurance policy—much like the Policy at issue here—unambiguously required direct physical damage to the insured premises for coverage. *Id.* at 7; *see also Newman Myers*, 17 F. Supp. 3d at 331 (finding that the words "direct" and "physical" require "actual, demonstrable harm of some form to the premises itself, rather than forced closure of the premises for reasons exogenous to the premises themselves, or the adverse business consequences that flow from such closure").

Mere loss of use or function does not constitute direct physical loss or damage even if the Property cannot perform its intended function. For example, in *Pentair Inc. v. American Guaranty & Liability Ins. Co.*, the inability of the insured's suppliers to function after a power failure did not

constitute physical loss or damage to the premises.  400 F. 3d 613 (8th Cir. 2005).  The court explained that the insurance policy provided coverage for "all risk of direct physical loss or damage to" the property, but adopting the insured's reasoning "would mean that direct physical loss or damage is established *whenever* property cannot be used for its intended purpose," which is not what the policy provides.  *Id.* at 615.

Similarly, reduced demand caused by a governmental order that places limitations on the hours a business can operate alone do not constitute "direct physical loss of or damage to" property.  In *Brothers, Inc. v. Liberty Mutual Fire Insurance Co.*, the local government imposed a 5:30 p.m. curfew and prohibited the sale of alcoholic beverages in response to civil unrest following the assassination of Martin Luther King, Jr.  268 A.2d 611 (D.C. 1970).  The insured suffered no physical damage to its property as a result of any riots, and the court held that the policy did not provide coverage for the claimed reduction in business resulting from the inability to conduct business at the insured property after 5:30 p.m. because it was not a "direct physical loss of or damage to" the property.  *Id.* at 613.  The court found that "[a]t the most, the loss incurred here was an indirect, if not remote loss resulting from riots."  *Id*.

As the foregoing cases demonstrate, "direct physical loss" requires more than a temporary and partial limitation of operations at the Property, which is the most that has occurred here.  To permit Town Kitchen to state a claim based on allegations of purely economic losses that are not tied to a covered property loss would extend property insurance coverage for every slowdown in operations caused by any external factor—a slowdown in tourist season, bad weather, unfavorable customer reviews, etc.  This is not the coverage that Town Kitchen purchased, nor the coverage that the Insurers agreed to provide.  The Policy requires that Town Kitchen suffered a direct physical loss of or damage to the Property.  Town Kitchen cannot plead any such loss, and for that

reason, the Complaint should be dismissed.

**C.     The "Period of Restoration" definition further demonstrates that a Covered Loss requires a tangible change to the physical characteristics of the Property.**

The Policy further requires a loss of or damage to the Property that necessitates the repair, rebuilding, or replacement of the Property—i.e., the "Period of Restoration."[9]  Adopting Town Kitchen's argument for coverage would completely ignore the "Period of Restoration" language of the Policy, and the Court must construe the Policy as a whole and give meaning to each provision.  Indeed, "[a] construction that neutralizes any provision of a contract should never be adopted if the contract can be so construed as to give effect to all the provisions."  *Westport Ins. Co. v. Tuskegee Newspapers, Inc.*, 402 F.3d 1161, 1168 (11th Cir. 2008) (quoting J. Appleman, *Ins. Law and Practice* § 7383 (1981)); *see also Nat'l Union,* 906 So. 2d at 302; *accord Ramada Inn*, 835 F.2d 812 at 814; *Mama Jo's*, 2018 WL 3412974, at \*10.

There is no "Period of Restoration" here because the Property does not need to be repaired, rebuilt, or replaced, and there is no need to move the business to a new permanent location.  At all times, the government orders permitted Town Kitchen to continue to use its restaurant to prepare and serve food and alcohol for off-site consumption.  To allow Town Kitchen to plead a claim for coverage based on losses that are not physical, and thus do not require repair, rebuilding, or replacement, would render that definition, and the entire coverage part, meaningless because the end date of the coverage would be triggered by an event that would never occur.  This would

---

[9] "Period of Restoration", Dkt. 6-1 at p. 54, CP 00 30 10 12, is defined as the time period that:

    **a.**    Begins 72 hours after the time of direct physical loss or damage caused by or resulting from an Covered Cause of Loss at the described premises; and

    **b.**    Ends on the earlier of:

        (1)    The date when the property at the described premises should be repaired, rebuilt  or replaced with reasonable speed and similar quality; or

        (2)    The date when business is resumed at a new permanent location.

effectively remove any defined limit on the time period for covered losses (aside from the full policy term). This surely cannot be the result intended, and cannot be the result of sound policy interpretation.[10] *See Interest*, 103 So. 3d at 497.

**D.    The absence of a virus exclusion does not prove the existence of a "Covered Cause of Loss."**

In the Complaint, Town Kitchen asks the Court to infer that the Policy's absence of a virus exclusion means that losses related to viruses are covered under the Policy. *See* Dkt. 6 at ¶¶ 13-15. Not so. An insured bears the initial burden of demonstrating that the insured property suffered a covered loss, and cannot look to exclusions to establish coverage. *Mejia*, 161 So. 3d at 578; *see also State Farm Fire & Cas. Co. v. Ctc Dev. Corp.*, 720 So. 2d 1072 (Fla. 1998) (explaining that "exclusionary clauses cannot be relied upon to create coverage" and, instead, the pertinent provisions in an insurance policy should be read *in pari materia*); *see also LaMarche v. Shelby Mut. Ins. Co.*, 390 So. 2d 325, 326 (Fla. 1980); *Lassiter Constr. Co. v. Am. States Ins. Co.*, 699 So. 2d 768, 769 (Fla. 4th DCA 1997). In succinctly rejecting this same argument in a COVID-19 coverage dispute, the court in *Rose's 1* explained that the presence or absence of a virus exclusion does not inform the analysis of whether there has been direct physical loss or damage in the first instance. *See Rose's 1, LLC*, Case No. 2020-CA-002424, attached as Ex. 4 at p. 10.

The insuring agreement sets the contractual liability, and it is incumbent upon Town Kitchen to prove that a claim falls within the Policy's affirmative grant of coverage. Ultimately,

---

[10] Moreover, there can be no "Period of Restoration" here because, as explained in the World Health Organization ("WHO") website Town Kitchen cites in its Complaint, *see* Dkt. ¶ 6 at ¶ 24, n.5, the COVID-19 virus only lasts for up to three days on surfaces and dissipates after that. Moreover, as explained on that same WHO website, COVID-19 "can ***easily be cleaned with common household disinfectants.***" *Id.* at https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/q-a-coronaviruses (emphasis added). This ephemeral presence cannot by any stretch amount to a loss or damage that is "physical" or requires repair. *See id.* (explaining COVID-19 "can survive for up to 72 hours on plastic and stainless steel, less than 4 hours on copper and less than 24 hours on cardboard").

the existence or absence of exclusions is of no consequence if there is no initial grant of coverage, and therefore, the absence of an exclusion cannot create coverage where none exists.  *See id*.

## II.     "Civil Authority" coverage is not triggered absent a damage to other property and an action of Civil Authority that prohibits access to the Property.

Town Kitchen avers that coverage exists pursuant to the Policy's Additional Coverage provision for "Civil Authority."  As evident from the Policy, coverage under the Civil Authority provision applies when (1) a Covered Cause of Loss causes *damage to property other than at the described premises* and (2) because of that damage to a nearby property, a civil authority *prohibits access* to Town Kitchen's Property.  In other words, the civil authority must prohibit access to the Property because nearby property damage has created a dangerous condition.  Town Kitchen cannot plausibly allege facts to satisfy either of these necessary elements.

### A.     There was no damage to other property caused by a Covered Cause of Loss.

First, Town Kitchen does not allege that there was any damage to "property other than property at the described premises" caused by a "Covered Cause of Loss."  "Covered Cause of Loss" means "Direct physical loss unless the loss is excluded or limited under this coverage form."  Dkt. 6-1 at p. 60, CP 10 30 09 17.  There was no "direct physical loss" to any property.  To be sure, the government orders limiting Town Kitchen's operations were intended to curb the possible threat of transmission of COVID-19 among large groups of people within an area, not physical loss to any property.  *See* Dkt. 6-3, 6-4, 6-5, 6-8, 6-9, 6-10; Exs. 1-2.  Moreover, Town Kitchen never alleges that the COVID-19 virus was actually on surrounding properties (or its own Property for that matter), but even if that were the case, the presence of the COVID-19 virus on any premises does not constitute direct physical loss, as explained above.  Therefore, Civil Authority coverage does not apply.  *See Rose's 1, LLC*, Case No. 2020-CA-002424, attached as Ex. 4 at p. 5 (denying coverage for alleged COVID-19 losses and explaining that the insureds "offer no evidence that

COVID-19 was actually present on their insured properties at the time they were forced to close. And the mayor's orders did not have any effect on the material or tangible structure of the insured properties."); *Gavrilides Mgmt. Co.*, No. 20-258-CB, attached as Ex. 5 at 23:5-15 (dismissing with prejudice because no additional facts "could possibly change that [COVID-19 and government orders] do not constitute the direct physical damage or injury" required to trigger coverage).[11]

### B.    Access to the Property was not prohibited by action of any Civil Authority.

Second, even if Town Kitchen could establish damage to property other than at its premises (which the Insurers deny), the plain language of the Policy requires an action of civil authority that prohibits access to the Property to trigger coverage.  No such action occurred here.  No government order prevented Town Kitchen, its employees, or even customers and delivery persons from accessing or entering the Property, nor does Town Kitchen allege that any roads or public walkways leading to the Property were closed.  To the contrary, the government orders encouraged restaurants like Town Kitchen to remain open for takeout and delivery service, and even expanded those services to include the sale of alcoholic beverages for off-premises consumption.  Exs. 1-2. Stated simply, the inability to seat diners at Town Kitchen's restaurant (or nearby restaurants), while indeed a disruption to business, does not amount to an action of civil authority *prohibiting access* to Town Kitchen's Property, and under these circumstances, no coverage exists under the Policy.  Dkt. 6-1 at p. 47, CP 00 30 10 12.

Courts interpreting similar civil authority provisions repeatedly have held that government

---

[11] Cases addressing losses resulting from occurrences other than COVID-19 similarly hold that direct physical loss of or damage to the property is required to trigger civil authority coverage.  *See, e.g., Dickie Brennan & Co., Inc. v. Lexington Ins. Co.*, 636 F. 3d 683, 686-87 (5th Cir. 2011) ("Civil authority coverage is intended to apply to situations where access to an insured's property is prevented or prohibited by an order of civil authority issued as a direct result of physical damage to other premises in the proximity of the insured's property."); *United Airlines, Inc. v. Ins. Co. of State of Pa.*, 385 F. Supp. 2d 343, 353 (S.D.N.Y. 2005) (holding civil authority coverage did not apply to a business interruption claim arising from the grounding of flights after the 9/11 attacks because the flights were grounded to prevent further terrorist attacks, not because of damage to other property in the surrounding area).

orders impeding access to the insured property, but not actually prohibiting access, are insufficient to trigger civil authority coverage. *See, e.g.*, *Rose's 1, LLC*, Case No. 2020-CA-002424, attached as Ex. 4 at p. 5; *Kean, Miller, Hawthorne, D'Armond McCowan & Jarman, LLP v. Nat'l Fire Ins. Co. of Hartford,* No. 06-770-C, 2007 WL 2489711, at *1 (M.D. La. Aug. 29, 2007) ( civil authority provision not triggered by Louisiana government order advising residents to stay off the streets prior to Hurricane Katrina because advisories did not "prohibit access" to the insured premises); *Philadelphia Parking Auth. v. Fed. Ins. Co.*, 385 F. Supp. 2d 208 (S.D.N.Y. 2005) (granting motion to dismiss because FAA notice grounding airplanes as a result of the 9/11 attacks did not actually prohibit access to the insured's parking garages, even if the order eliminated the need for the parking spaces); *Abner, Herman & Brock, Inc. v. Great Northern Ins. Co.*, 308 F. Supp. 2d 331 (S.D.N.Y. 2004) (holding civil authority coverage only applied during a four-day period where the government order prohibited access to the insured's premises following 9/11, but not during the following 25-day period where traffic restrictions made access more difficult); *accord Syufy Enter. v. Home Ins. Co. of Ind.*, No. 94-0756, 1995 WL 129229 (N.D. Cal. Mar. 21, 1995); *54th St. Partners v. Fid. & Guar. Ins. Co.,* 305 A.2d 67 (N.Y. Super. Ct. App. Div. 2003).[12]

Town Kitchen has not alleged that any physical damage occurred due to COVID-19 or that the government orders it relies on actually prohibited access to the Property. The orders were entered to address the health dangers presented by COVID-19 and slow the spread of the virus—

---

[12] Similarly, where orders of civil authority are issued as a preventative measure or as a precaution against future damage, courts routinely have held that no coverage is afforded. *United Air Lines, Inc. v. Ins. Co. of State of Pa.,* 439 F.3d 128 (2d Cir. 2006) (civil authority order issued after 9/11 "based on fears of future attacks" and where the timetable for lifting the order "had nothing to do with repairing, mitigating, or responding to the damage caused by the attack on the Pentagon"); *see also Jones v. Chubb Corp.*, CIV.A. 09-6057, 2010 WL 4026375, at *3 (E.D. La. Oct. 12, 2010) ("Reading the Civil Authority section as a whole, it is clear that it was not written with the expectation that a civil authority order prohibiting access would issue *before* the property damage that forms the basis of the order actually occurs."); *accord South Tex. Med. Clinics, P.A. v. CNA Fin. Corp.*, No. H-06-4041, 2008 WL 450012, at *10 (S.D. Tex. Feb. 15, 2008).

PD.29334995.1

not to curb property damage caused by COVID-19.  Dkt. 6-3, 6-4, 6-5, 6-8, 6-9, 6-10; Exs. 1-2. In fact, the date of loss Town Kitchen submitted to the Insurers (March 3, 2020) predates all of the government orders cited in the Complaint, demonstrating that Town Kitchen's actions were voluntary, and not compelled by government orders.  *Compare* Dkt. 6 at ¶¶ 28-40 *with* Dkt. 6-11. Accordingly, Town Kitchen has not pled sufficient facts to trigger Civil Authority coverage.[13]

### III.    Coverage is barred by the Pollution Exclusion.

Even if the Court were persuaded that Town Kitchen has satisfied its burden of alleging an affirmative grant of coverage based on its allegations presuming the presence of COVID-19 at the Property, the pollution exclusion as written in the Policy, and interpreted under Florida law, would exclude Town Kitchen's claim and further require dismissal of the Complaint.

The Policy contains an exclusion for loss or damage caused by or resulting from "[d]ischarge, dispersal, seepage, migration, release or escape of 'pollutants.'"  "Pollutants" is not defined in the Causes of Loss form, but is defined in the Business Income (And Extra Expense) Coverage Form as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste."  Dkt. 6-1 at p. 45,  CP 00 10 10 12.

The Florida Supreme Court has recognized that pollution exclusions extend beyond merely "environmental or industrial pollution."  *Deni Assocs. of Fla., Inc. v. State Farm Fire & Cas. Ins. Co.*, 711 So. 2d 1135, 1138 (Fla. 1998) (holding that a claim arising from an ammonia spill fell within a policy exclusion).  The term "contaminant" is unambiguous (and broad) and Florida courts should not "place limitations upon the plain language of a policy exclusion simply because [the

---

[13] Buttressing this conclusion, the government orders cited in the Complaint distinguish between essential and non-essential business, the latter of which generally had to shut down.  *See, e.g.,* Dkt 6-5; Ex. 1.  This distinction demonstrates that the governmental closures were aimed at limiting community spread of COVID-19, and not based on identifying premises that have suffered property damage.  The nature of a company's business—and not the presence of property damage—was the criterion used by governments when issuing shutdown orders applicable to Town Kitchen.  *Id.*  Even so, Town Kitchen was considered an essential business that could remain open and operating.

court] may think it should have been written that way." *Id.* at 1139.

Federal courts applying Florida law have interpreted similar pollution exclusions to exclude from coverage microbial contaminants. *Nova Cas. Co. v. Waserstein,* 424 F. Supp. 2d 1325 (S.D. Fla. 2006). The *Nova* court reasoned that the ordinary meaning of "contaminant" included substances that "infected the plaintiffs' bodies or made them impure by contact." *Id.* at 1334. Relatedly, similar pollution exclusions have been applied to exclude coverage for "viral contaminants" and "harmful microbe[s]" found in an insured's swimming pool, from which a guest alleged that he contracted a virus. *See First Specialty Ins. Corp. v. GRS Mgmt. Assocs., Inc.*, No. 08-81345-CIV, 2009 WL 2524612, at *4-5 (S.D. Fla. Aug. 17, 2009); *see also James River Ins. Co. v. Ground Down Eng'g, Inc.,* 540 F.3d 1270 (11th Cir. 2008) (interpreting a pollution exclusion to exclude coverage for damage allegedly resulting from methane gas); *James River Ins. Co. v. Epic Hotel, LLC*, No. 11-CV-24292-UU, 2013 WL 12085984, at *4 (S.D. Fla. Jan. 9, 2013) (applying a pollution exclusion to bar coverage for claims arising from Legionnaire bacteria).

The virus causing COVID-19 falls within the Policy's definition of a "pollutant." COVID-19 is a virus that infects peoples' bodies, thereby fitting the ordinary meaning of "contaminant." *See Nova Cas. Co.*, 424 F. Supp. 2d at 1334. COVID-19 has been "designated or defined" as "dangerous" by both Federal and State ordinances and regulations. The U.S. Department of Health and Human Services has determined that the "SARS coronavirus" (SARS-CoV), to which COVID-19 is related, is a "biological agent . . . and a toxin" with "the potential to pose a severe threat to public health and safety." 42 C.F.R. § 73.3(a) & (b). The same orders Town Kitchen alleges establish its claim specifically reference the dangers posed by COVID-19 to people in the State of Florida. *See, e.g.*, Dkt. 6-4 ("Novel Coronavirus Disease 2019 (COVID-19) is a severe acute respiratory illness that can spread among humans through respiratory transmission and

presents with symptoms similar to those of influenza").  And, the EPA has found that viruses

constitute an indoor pollutant.  *See Stillman v. Charter Oak Fire Ins. Co.,* No. 92-1949-CIV, 1993

U.S. Dist. LEXIS 21618, *12 (S.D. Fla. Jun. 18, 1993), *vacated in part,* 88 F.3d 911 (11th Cir.

1996).  The virus may not cause property damage, but it poses a direct threat to human health.  As

a result, even if Town Kitchen could allege a covered property loss due to COVID-19, which the

Insurers deny, any such loss would necessarily be excluded by the plain language of the pollution

exclusion.  For this additional reason, the Complaint should be dismissed.

## IV.   The Complaint Contains Improper Class Allegations That Should Be Stricken Under Rules 12(f), 23(a), 23(b), and 23(d).

Should the Court not dismiss Town Kitchen's Complaint based on the foregoing reasons,

the Court should strike the class allegations for (1) failing to allege an ascertainable class and

(2) improperly using a Rule 23(b)(2) class to lay the ground work for a damages award.

### A.   Legal Standard for Striking Complaint and Class Allegations.

"Sometimes the [class certification] issues are plain enough from the pleadings."  *Gen. Tel.*

*Co. v. Falcon*, 457 U.S. 147, 160 (1982); *see also Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d

999, 1006 (11th Cir. 1997) (concluding that Rule 23(b)(3)'s predominance requirement could not

be satisfied, and that such failure was "readily apparent from a reading of the . . . complaint").[14]

In those circumstances, Rule 23 authorizes a motion to strike class allegations.  *See* Fed. R. Civ.

P. 23(d)(1)(D) (authorizing courts to "require that the pleadings be amended to eliminate

allegations about representation of absent persons"); Fed. R. Civ. P. 23(c)(1)(A) (class certification

---

[14] Courts, therefore, have not hesitated to strike class action allegations prior to the filing of motions for class certification where it was readily apparent that the Rule 23 requirements could not be satisfied.  *Vandenbrink v. State Farm Mut. Auto. Ins. Co.*, 2012 WL 3156596, *3 (M.D. Fla. Aug. 3, 2012) (granting motion to strike and noting "where the propriety of a class action procedure is plain from the initial pleadings, a district court may rule on this issue prior to the filing of a motion for class certification") (citing *MRI Assocs. of St. Pete, Inc. v. State Farm Mut. Auto. Ins. Co.*, 755 F. Supp. 2d 1205, 1207 (M.D. Fla. 2010)); *see also Pilgrim v. Universal Health Card LLC*, 660 F.3d 943, 949 (6th Cir. 2011).

decisions should be made at "an early practicable time").

      **B.**      **The Proposed Class Is Not Ascertainable under Rule 23.**

"Every class must be 'adequately defined and clearly ascertainable.'" *AA Suncoast Chiropractic Clinic, P.A. v. Progressive Am. Ins. Co.*, 938 F.3d 1170, 1174 (11th Cir. 2019) (quoting *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012)). "In order to establish ascertainability, the plaintiff must propose an administratively feasible method by which class members can be identified." *Karhu v. Vital Pharm., Inc.*, 621 F. App'x 945, 947–49 (11th Cir. 2015) (internal citations omitted).

Town Kitchen will be unable to meet the threshold Rule 23 requirement of ascertainability, and that defect is facially evident from the Complaint. Specifically, Town Kitchen's class definition has two requirements: that class members (1) have insurance policies similar to Town Kitchen's Policy, and (2) "have suffered covered losses" as described in the Complaint. Dkt. 6 at ¶ 64. The second requirement precludes an ascertainable class.

By not requiring class members to have filed claims (or some other objective criteria), there is no way to ascertain class members because no record would identify which policyholders have suffered "covered losses." This uncertainty is perhaps best highlighted by Town Kitchen's breach of contract claim, which hinges on the legal determination of whether Town Kitchen itself has suffered "covered losses" under the Policy. *See* Dkt. 6 at ¶¶ 71-80. The individualized assessment required for Town Kitchen's own claim demonstrates that identifying policyholders who suffered "covered losses" cannot be done on a class-wide basis, and "locating and vetting class members will devolve into the exact mini-trials that the ascertainability requirement is designed to prevent." *Dapeer v. Neutrogena Corp.*, No. 14-22113-CIV, 2015 WL 10521637, *11 (S.D. Fla. Dec. 1,

2015) (denying class certification because the proposed class was not ascertainable).[15]

Although a record of all policyholders exists, no record would demonstrate which policyholders have suffered "covered losses." For example, a list of all policyholders would be overinclusive because not every policyholder suffered a covered loss (e.g., an essential business that never closed), and even policyholders that submitted a claim may not have suffered "covered losses" if, *inter alia*, they were not profitable prior to the COVID-19 pandemic. Alternatively, some policyholders may have suffered "covered losses," but elected not to file a claim because the alleged loss did not exceed the policy's deductible, meaning there would be no way for the Insurers or Town Kitchen to ascertain these potential class members scattered across the state.[16]

No amount of discovery or expense will allow Town Kitchen to ascertain the proposed class members. Because Town Kitchen will be unable to satisfy this threshold requirement of Rule 23, this case cannot be prosecuted as a class action, and the Court should strike the class allegations of the Complaint now to preserve judicial and party resources.

### C.    The Proposed Class Cannot be Certified Under Rule 23(b)(2).

Before certifying a class under Rule 23(b)(2), the Court must determine "(1) whether [the] [d]efendant has acted on grounds generally applicable to the class as a whole, and if so, (2) whether declaratory or final injunctive relief is the appropriate and primary remedy." *Colomar v. Mercy*

---

[15] Moreover, by requiring class members to have suffered "covered losses," Town Kitchen impermissibly frames the class definition as a legal conclusion (i.e., that the losses are "covered"). *See, e.g., Likes v. DHL Exp.*, 288 F.R.D. 524, 531–32 (N.D. Ala. 2012) ("Another ascertainability issue raised by DHL stems from the language of the class definition, which mirrors the determinations that must be made under the WARN Act to assess liability. Some courts have referred to this as a 'fail-safe' class in which '[t]he proposed class definition is in essence framed as a legal conclusion.'") (internal citation omitted). This creates another barrier to ascertainability, which is exacerbated by the vague requirement that the class members' losses are "*as described in the Complaint.*" Dkt. 6 at ¶ 64.

[16] While the prospect of asking each potential class member if they suffered "covered losses" may hold superficial appeal for resolving this issue, the Eleventh Circuit has noted that self-identification of class members provides inadequate protection to defendants and implicates their due process rights. *Karhu*, 621 F. App'x at 948-49 (further noting that "protecting defendants' due-process rights by allowing them to challenge each claimant's class membership is administratively infeasible, because it requires a 'series of mini-trials just to evaluate the threshold issue of which [persons] are class members.'") (internal citation omitted).

PD.29334995.1

*Hosp., Inc.,* 242 F.R.D. 671, 682 (S.D. Fla. 2007) (citing Fed. R. Civ. P. 23(b)(2)).  Taking Town Kitchen's allegations as true, the Complaint facially fails to demonstrate grounds for Rule 23(b)(2) certification because the declaratory relief Town Kitchen is seeking is *not* the "primary remedy."

Rule 23(b)(2) certification is "appropriate only if the predominant relief sought is injunctive or declaratory." *DWFII Corp. v. State Farm Mut. Auto. Ins. Co.,* 469 F. App'x 762, 765 (11th Cir. 2012) (internal quotations omitted).  On the other hand, monetary damages (which are more appropriately suited for Rule 23(b)(3) class actions) can "only be awarded in Rule 23(b)(2) class action when the damages sought are *incidental to* the claims for equitable and declaratory relief." *Mills v. Foremost Ins. Co.,* 269 F.R.D. 663, 674 (M.D. Fla. 2010) (emphasis in original). This means that the request for declaratory relief must "correspond" with the injunctive relief.  *Id.* Critically, the Eleventh Circuit has explained that "an action seeking a declaration concerning [the] defendant's conduct that appears designed simply to lay the basis for a damage award rather than injunctive relief would not qualify under Rule 23(b)(2)."  *AA Suncoast Chiropractic Clinic, P.A.,* 938 F.3d at 1179 (11th Cir. 2019) (quoting 7AA Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1775 (3d ed. 2005)); *see also Christ v. Beneficial Corp.*, 547 F.3d 1292, 1298 & n.11 (11th Cir. 2008).

In this action, Town Kitchen's claim for a class-wide declaratory judgment does nothing more than lay the basis for a damage award, i.e., the insurance benefits Town Kitchen and putative class members are seeking under the policies for the "covered losses" they "*have* suffered."  (Dkt. 6 at ¶ 64) (emphasis added).  If Town Kitchen obtains the sought-after declaration that the subject insurance Policy "provides coverage for COVID-related losses," the damages would not be *incidental* to the declaratory relief—they would be one and the same.  Stated another way, without the accompanying insurance benefits for "covered losses," the declaratory relief is illusory and

provides nothing to the proposed class.

This is not the type of class that is intended to fall under Rule 23(b)(2).  Instead, as noted by the Supreme Court, "'[c]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples' of what (b)(2) is meant to capture."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 361 (2011) (quoting *Amchem Prods. v. Windsor,* 521 U.S. 591, 614 (1997)). "In particular, [Rule 23(b)(2)] reflects a series of decisions involving challenges to racial segregation."  *Id.*  The Supreme Court's discussion of Rule 23(b)(2)—rooted in desegregation litigation—stands in stark contrast to the eventual monetary relief that Town Kitchen and putative class members would seek here if the declaratory relief were granted on this coverage issue.  *See id.; see also Ass'n for Disabled Ams., Inc. v. Amoco Oil Co., 211 F.R.D. 457, 465 (S.D. Fla. 2002).*

The allegations of Town Kitchen's Complaint make clear that Town Kitchen and the putative class members are seeking "insurance coverage for their losses" already incurred, and that their "ability to survive this pandemic depends" on obtaining those insurance benefits.  Dkt. 6 at ¶ 83.  There is no purpose for seeking a declaration of coverage in this action other than laying the predicate for a damages award, and for that reason, Rule 23(b)(2) is an improper vehicle.  The Court should strike Town Kitchen's Rule 23(b)(2) class allegations and proposed class.

## CONCLUSION

When distilled, Town Kitchen alleges purely economic losses as a result of a limitation on its operations due to COVID-19, without any corresponding property damage.  Though certainly an interruption to Town Kitchen's business, these losses are not covered under the commercial property insurance policy at issue, and the Court should dismiss the Complaint with prejudice. Should the Court not dismiss the Complaint entirely, the Insurers request that the Court strike Town Kitchen's class allegations for proposing an unascertainable class that cannot be certified.

## Rule 7.1(a)(3) Certification

Pursuant to Local Rule 7.1(a)(3), Defendants' counsel conferred with Plaintiff's counsel in a good-faith effort to resolve the issues raised in the Motion to Strike.  Plaintiff's counsel opposes the relief sought in this motion regarding such issues.

Respectfully submitted,

**PHELPS DUNBAR LLP**

*/s/ John D. Mullen*
John D. Mullen (FBN 32883)
Sarah B. Van Schoyck (FBN 70979)
Jason A. Pill (FBN 70284)
100 South Ashley Drive, Suite 2000
Tampa, Florida 33602-5311
813-472-7550 (telephone)
813-472-7570 (facsimile)
john.mullen@phelps.com
sarah.vanschoyck@phelps.com
jason.pill@phelps.com

*Counsel for Defendants Certain Underwriters at Lloyd's, London, Known as Syndicate ENH 5151, NEO 2468, XLC 2003, TAL 1183, TRV 5000, AGR 3268, ACS 1856, NVA 2007, HDU 382, PPP 1980, AMA 1200, ASC 1414 and VSM 5678, and Indian Harbor Insurance Company, and HDI Global Specialty SE*

PD.29334995.1

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 20, 2020, I electronically filed the foregoing document with

the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing

to:

> Michael E. Criden
> Kevin B. Love
> Lindsey C. Grossman
> CRIDEN & LOVE, P.A.
> 7301 SW 57TH Court
> Suite 515
> South Miami, Florida 33143
> mcriden@cridenlove.com
> klove@cridenlove.com
> lgrossman@cridenlove.com
>
> Jason S. Mazer
> CIMO MAZER MARK PPLC
> 100 Southeast 2nd Street
> Suite 3650
> Miami, Florida 33131
> jmazer@cmmlawgroup.com
>
> Linda P. Nussbaum
> Nussbaum Law Group, P.C.
> 1211 Avenue of the Americas
> 40th Floor
> New York, NY 10036
> lnussbaum@nussbaumpc.com

*/s/ John D. Mullen*
Counsel for Defendants

PD.29334995.1